Ebner v. Cobb County. Sean Young, Plaintiff's Attorney, Plaintiff's Office May it please the Court? My name is Sean Young, and I represent plaintiffs in this case. This case involves three Fourth Amendment by Monell claims brought solely against the Cobb County Police Department based on the blood draws and the trip to the hospital, prolonged detention, and malicious prosecution of our clients in 2016. Plaintiffs allege that these three unconstitutional searches and seizures were caused by a Cobb County Police Department policy or practice which trains officers to erroneously believe that six roadside eye examinations and field sobriety tests can detect whether someone has been driving under the influence of drugs. Plaintiffs' experts, however, opine that neither these eye exams nor field sobriety tests reliably detect drug impairment. And so the success of all three of these claims turns primarily on whether a jury believes plaintiffs' experts. But instead of allowing a jury to decide whether to believe them, the district court granted summary judgment to defend it, never once mentioning this critical expert testimony in its opinion. Its decision should be reversed. First, I will very briefly address the acronym. Take the eye exams out? Mm-hmm. Are there not, though, numerous clues that would support probable cause? No, Your Honor. The standard field sobriety tests were also criticized by our second expert as being unable to detect, reliably detect the presence of drugs. When you take that out, all you have is a failure to maintain lane. I didn't read your brief as challenging those other standard field sobriety tests. Where did I miss that? Oh, that was, we did emphasize the eye exams. So on page 14 of our opening brief, we talk about our second expert, Josh Ott, who is a former police officer. And he says that the only thing that the standard field sobriety tests have ever been validated for is for, to indicate whether someone has a specific blood concentration level or higher. They have never validated the test to indicate any sort of impairment whatsoever or anything in relation to drugs. And so because we have criticized both of those — So he testified, right, that it's just up in the air as to whether the results of each test should mean to an officer that there's probable cause. The ophthalmologist said it was like flipping a coin. The second expert said it was like blindly sending police officers out to apply this test that doesn't detect drugs. But didn't the expert say that for lack of convergence, bloodshot eyes, eyelid tremors, pupil dilation, and lack of nystagmus, each was associated with cannabis use? No. Our first expert, and this is listed on page 13 of our opening brief, says that each of those things do not indicate the presence of drugs, do not reliably indicate the presence of drugs. And so if a jury were to believe that testimony, there would be no probable cause. All you would have is a simple failure to maintain lane. And simply failing to maintain a perfect vector down a highway cannot, on its own, establish probable cause that someone has been driving under the influence of drugs. At a minimum, it's a genuine issue of material fact. Very briefly, addressing the acronym issue, which appears to be the basis of the district court's opinion. I want to make — I want to go back to what I had originally asked about. So, each individual swerved while driving and failed to maintain their lane, right? Each plaintiff touched the lines once or twice. Okay. Yes. Ebner displayed four clues suggesting impairment. Mbara — Mbamara? I'm sorry, I don't know how to pronounce that. It's okay, Mbara. Mbara. One-legged stand test, right? Penwell, one-legged stand test. Oryami, the walk and turn test, right? And the one-legged stand test. The clues range from turning incorrectly, missing heel to toe, taking an incorrect number of steps, walking off the line, raising arms for balance. Even if you take out the I, why isn't there enough here to establish probable cause? Because the tests that you mentioned are part of the standard field sobriety tests, and those were also criticized by our second expert, Josh Ott, who says that those tests also do not reliably detect impairment by drugs. And those tests — and this is why this Court explained in Kingsland that you do have to look at the totality of the circumstances, and field sobriety tests' results cannot be taken in isolation. He admitted, though, that those would work for alcohol? Correct. Well, he said that those tests have only been validated for alcohol. The way those tests worked — that it's not impairment for cannabis. Correct. Correct. What typically happens is these field sobriety tests are like a threshold test. They're a non-invasive threshold test for alcohol, and that's traditionally how they're used. And then it's often followed by a breathalyzer. So, for example, one of our plaintiffs, Ebner, within 18 minutes of her stop, she was given a breathalyzer after she did these tests, and it was 0.00% BAC. And at that point, unquestionably, there was no probable cause for alcohol. Do you think there is any way besides smelling or seeing marijuana for an officer to reliably enough conclude that a driver may be impaired by marijuana? Yes. So in the training materials in a lot of the cases that we see, there are gross or obvious signs of impairment, such as someone completely falling out of their car. There's odor, like Your Honor mentioned. But how is falling out of the car necessarily marijuana? Why couldn't that be also alcohol? It could. It could. Those kinds of egregious signs, but also what we call vehicle in motion, that's what the vehicle was doing leading up to the point of being pulled over. So like in Kingsland, or apologies, like in the Seventh Circuit case, Kingsland was relying on the car had plowed through several residential lawns. Luckily, it didn't hurt anyone. Is that what it takes to pull over someone for marijuana use? No, but it definitely takes more than simple failure to maintain lane. Let me follow up with one thing, because I want to make sure. I hope that I misheard you, because I want to make sure that we're discussing your expert report accurately. Page 10 of 20 says, in regard to convergence, cannabis may indeed impair convergence. It also says, in regard to pupillary size and abnormalities, cannabis may indeed affect pupillary size and function, et cetera. All of the things that I listed to you a moment ago, that I said that your expert conceded could be affected by cannabis, have similar language in the report. Now, maybe you don't think it's enough, but . . . In regard to eyelid tremors and conjunctival injection or redness of the white part of the eye caused by dilation of blood vessels on the surface of the white part of the eye, cannabis may indeed cause eyelid tremors and or conjunctival injunction. And then on page 11, he says, but there's no evidence that reddening of the conjunctiva or the eyelid tremors are a reliable sign of the presence of drugs. And that's something . . . That's certainly not something defendants have argued. It may be, but it may not be. Would be the fairest conclusion of your own expert's report. But the ophthalmologist . . . But just because something might be doesn't make it reliable. So . . . But what's the standard for probable cause, which isn't very much? The standard is whether something is reasonably trustworthy. And if you at a minimum construe this record . . . A kind of fair probability, right? Or a fair probability. And if you construe the expert's report in favor of plaintiffs at a minimum — and those are points, Your Honor, that defendant may want to cross-examine him on at trial. But if you construe the record in favor of the plaintiffs, a jury could conclude that these tests are not a reasonably trustworthy method of detecting marijuana and is like, as the expert said, flipping a coin. And that's why this case should go to trial. I would just add, in terms of failing to maintain Lane, if it is important that this Court not hold as a matter of law or even suggest that simply failing to maintain Lane alone can give rise to impairment, because . . . I'm sorry? How about if you can't touch your nose? Do it. It's a totality-of-the-circumstance test, and actually all four plaintiffs did touch their nose. Some percentage of the time, right? But that percentage was for at least, I think, 5 out of 6, not 100 percent. But they did pass. They did pass it most of the time. They were not . . . It's true they were not able to detect how long it takes for 30 seconds to pass. But these are tests that are designed as a threshold, a noninvasive way to detect alcohol, and it's followed by a breathalyzer. At a minimum, Ebner, she, within 18 minutes, got a 0.00 percent BAC, and under this Court's decision in Barnett, it's over by then for her. And for the rest, they weren't even given breathalyzers because the officer didn't believe there was enough. Do breathalyzers detect cannabis or only alcohol? Oh, they only detect alcohol. What I'm saying is there's no evidence of impairment, no probable cause of impairment for the plaintiffs, and especially not the one that took the breathalyzer. If I may quote from the Tenth Circuit, which decided a case involving failure to maintain lane, if failure to follow a perfect vector down the highway or keeping one's eye on the road were sufficient reasons to suspect a person of driving while impaired, a substantial portion of the public would be subject each day to an invasion of their privacy. And that's very important in this case. At a minimum, Your Honors, this case should go to the jury to decide whether there was a probable cause. Help me with this. Your affidavits were in 2018, I think, and these arrests all occurred in 2016. Is that correct? Correct. Okay. What puts Cobb County on notice at that time of making the arrests and using these tests that are authorized and approved that they're unreliable? We don't have evidence that they were necessarily put on notice at that time. I'm talking about in this record. There is no notice at all of any shape or form that Cobb County was aware of what your experts say. Correct, Your Honor. So then help me like in our failure to train. I'm trying to find an analogy because I couldn't find a case like this. Okay. Where you've got to have at least some knowledge constructive. Otherwise, that this test, forget about the eye test. The field sobriety test, because it's counterintuitive to me, the field sobriety, whether you can walk and do all those field sobriety tests, don't at least have some relevancy to whether you're an influence of some substance. I don't see how they're just alcohol. Okay. So no evidence of the record that Cobb County had any knowledge that this was a problem for drugs, right? No, and plaintiffs don't have to show that because under the Supreme Court's decision in Brown where a plaintiff claims that a particular municipal action itself violates federal law, there is no state of mind requirement. Okay. I understand we're not deliberate indifference and we're not in some of that area of the law, but it seems like you're saying you still got to knowingly use an unreliable test. Your cause of action, as I understand it, is they violate your constitutional rights of your clients because they were knowingly using an unreliable test. No, subtract the knowingly. Strict liability. You come in and say something they're doing, then you're saying it's strict liability. If we show the test is unreliable by filing to experts, they're strictly liable. Like this Court's decision in Barnett. That's a yes or no. I'm just trying to understand. Yes, Your Honor. As in this Court's decision in Barnett, there was no notice requirement for the unconstitutional DUI 8-hour hold policy, and, of course, the jury still has to believe our experts. Okay. Thank you. Okay. Thank you, Mr. Young. You've saved three minutes for rebuttal. Mr. Weaver. Thank you, Your Honor. My name is George Weaver, and this is Laura Murphy representing Cobb County on this appeal. We contend that there are three elements that are necessary for the plaintiff's claims to proceed against Cobb County that are missing here, and these are conjunctive, all are necessary. First is an underlying constitutional violation, as required by Baker v. McCollin. Second is the identification of a defective policy, according to Minnell. And in Owens v. City of Atlanta, this Court said that a policy, in order to be Third, we think, as you've indicated in some of your questions, that there's no sufficient evidence on this record of causation between the allegedly deficient eye exams and the actions of Officer Carroll, because other factors supported his actions. Let me first mention briefly the underlying constitutional violation issue. Judge Brown held at page 39 of his summary judgment order that Officer Carroll had not committed an underlying constitutional violation against the plaintiffs here. The plaintiffs acknowledged this in their opening brief at page 6 in this Court. We say that dropping Carroll from the appeal, in effect, bars the claims against Cobb County. We cited Wilhawk v. Halpin for that proposition. You're not going to get very far with that. All right. No, no. That's not right. Let me just make a final point, Judge. Here we have an unappealed determination of no underlying violation, not just an absence of liability against Officer Carroll. But let me move to the defective policy issue. And so you understand this because it's a custom policy of the county, and we're not looking to the individual officer. I understand, Your Honor. You can sue without ever having sued the officer. Oh, yes. They could have sued only Cobb County. The fact that there's no finding against him doesn't matter. Well, but they chose to sue both, and then they got a determination of no violation. So let me move to the identification of the policy issue. The plaintiffs, in order to succeed against Cobb County, have to show that there's a defective policy that contains, as I mentioned in the Owens v. City of Atlanta case, a fault element. And plaintiffs have played hide-and-seek with this issue. Judge Brown threw up his hands and held, quote, the court alternatively finds that plaintiffs have failed even to plead adequately a formal or informal policy that could support liability against defendant Cobb County, close quote. That's his summary judgment order at page 39. In Keating v. City of Miami, 598F3rd753, this court held in 2010, quote, although Rule 8, and that's the notice pleading standard, allows a plaintiff considerable leeway in framing its complaint, this circuit, along with others, has tightened the application of Rule 8 with respect to Section 1983 cases in an effort to weed out non-meritorious claims, requiring that a 1983 plaintiff allege with some specificity the facts which make out its claim, close quote. In our case, examples of these shifting allegations concerning policy include the following. In the first amended complaint, Document 9 in the record, plaintiffs referred to the Drug Recognition Expert Protocol, as to which Officer Carroll was trained, but it's undisputed it was not performed here. That DRE, for short, was formulated by the National Highway Traffic and Safety Administration, and it contains 12 steps. It's not performed roadside, but instead at a neutral location, and it's performed post-arrest, not before arrest. But they refer to it over 20 times in their complaint, and they allege both that it's defective and that it was not properly performed. This is in their first amended complaint, which we think is inconsistent. Also in their complaint, they raise a training claim, and apparently they're saying that Officer Carroll was not properly trained to perform DRE, which, as I noted, was not even done here. Instead, he used the A-RIDE, the Advanced Roadside Impaired Driving Enforcement Protocol, which is a different protocol also formulated by the National Highway Traffic and Safety Administration. Then, in their reply brief in this court, plaintiffs apparently attempt to withdraw their training claim. Instead, they travel on the theory that the county is guilty of an unconstitutional policy, as in the Monell case where the Supreme Court recognized that the policy of the City of New York was itself unconstitutional. So apparently the plaintiffs are now claiming not that the training was necessarily bad, but instead that the use of the eye exams that are criticized by Dr. Adams is itself unconstitutional, even though it's part of protocols formulated by a Federal agency and used throughout the country. This Court said in Craig v. Floyd, and that is 643 F. 3rd. 1306, 2011 case, this Court said, in the absence, quote, in the absence of a series of constitutional violations from which deliberate indifference can be inferred, the plaintiff must show that the policy itself is unconstitutional. So plaintiffs have to show that the policy is unconstitutional on its face, this protocol formulated by a Federal agency used throughout the country, or they have to show deliberate indifference in the training process at Cobb County. And apparently they're trying to back away from the deliberate indifference standard. But it's necessary to keep in mind that an elevated level of fault or culpability is necessary in order to attach liability against an entity like Cobb County, in order to avoid a slide into liability based on respondeat superior, which all the case law says is not acceptable. In DePuy v. City of St. Mary's, 787 F. 2nd. 1496, this Court in 1986 upheld a jury verdict against the City of St. Mary's, Georgia. In that 1983 case, which involved alleged excessive force, the Court said, quote, the City had knowledge of improper police conduct but failed to take proper remedial action. The continued failure of the City to prevent constitutional violations by its police force is precisely the type of informal policy or custom that is actionable under Section 1983, close quote. Now, this is an example of, I think, what you were getting at, Judge Hull, where you have prior events that put the City on notice, City of St. Mary's in this case, on notice that there's a problem. And in that case, there was evidence at trial of five prior excessive force incidents over the two years before the arrest of the plaintiffs. Do you agree that even if you stripped out the evidence from the challenged eye tests, there would have been plenty of probable cause to believe that these people were under the influence of drugs? Yes, Your Honor, I do. I think that the erratic driving and the field sobriety test results, the cues or clues from those tests, would support the existence of probable cause. And let me speak, if you don't mind, Your Honor. His argument in opposition to that is that Ott's testimony, that the non-eye tests don't reliably indicate impairment by cannabis, makes summary judgment for you inappropriate on that ground. And what do you say about that? As I understood it, that was his argument. I think he's mainly using Dr. Adams, Neal Adams, to argue that point. Dr. Adams says that even a trained ophthalmologist, at his deposition he said, even a trained ophthalmologist cannot use the results of these eye exams, like red and conjunctival, lack of convergence, bloodshot eyes, and so forth, cannot use those to diagnose impairment from drugs or alcohol. But you have to keep in mind that Judge— That's not the question I was asking, I don't think. So, as I understood it, what he said was, what your opponent said was, that for the non-eye test, right, the field sobriety— The non, non. I thought you said nine. I'm sorry, Judge. The non-eye test. Test. Okay. The field sobriety test, that those, that there's expert testimony that those do not reliably indicate marijuana impairment. All right. And what's your response to that? Well, Joshua Ott, their DUI expert, I think he did not say what has been portrayed here. He testified in his deposition, pages 126 and 127. Question. Mr. Ott, as in the other cases, you're not testifying that Officer Carroll acted improperly in taking this subject, speaking in particular of Mr. Oriame, but referring to all the cases, into custody for suspicion of impaired driving. Answer. I'm not disputing his arrest. Question. You're not disputing the existence of probable cause for the arrest. Is that right? Answer. That's correct. I'm not disputing that. So, we think that their DUI expert did not say that the results of the field sobriety test are unreliable when it comes to detection of impaired driving. What did the expert say about the field sobriety test? Well, he said that he agreed with the decision of Officer Carroll to arrest these people for impaired driving. In the language I just quoted from his deposition. Did he specifically address the field sobriety test? I think he did. I think he said in his deposition and in his report that he observed, and it was dark at the time of all of these arrests, they were late at night, but he said he agreed that field sobriety tests, clues or cues, were indicated by the plaintiffs to the extent he could see them. And based on those, he said he supported the decision of Officer Carroll to conduct the arrest for impaired driving. Here's what I thought had happened. I thought and I had testified that the field sobriety tests are invalid because they've never been studied for that purpose. In his view, it's really up in the air as to what the results of each individual test should mean to an officer as to whether there's probable cause. But he conceded the tests reliably indicate impairment for driving under the influence of alcohol. And it seemed to me that the proposition that the tests have never been formally studied for a particular purpose is not the same thing as saying that they're inherently unreliable and not reasonably trustworthy. So it does not seem to me to defeat the idea that the officer could have concluded that there was probable cause based on those field sobriety tests. But am I understanding the testimony and the logical sequence there correctly? I think you are, Your Honor. And in the record documents 60-7, 8, and 9 are materials from the National Highway Traffic and Safety Administration that are used in this training process. And they're primarily focused on alcohol, impaired driving from alcohol, but they also discuss impaired driving from other causes. Keep in mind that Officer Carroll stopping these four plaintiffs late at night after erratic driving, he cannot conduct a diagnostic test like a urine test or a blood test beside the road. And so he doesn't know for sure what substance might be causing the erratic driving. So it's a probable cause determination, and that doesn't require a great deal of evidence, as you've indicated, Judge Pryor. I have a question. Let's assume for purposes of this question that all of the field sobriety indicators are appropriate and effective, except for the ones that are being challenged here, right? So let's suppose that we use all of the other field sobriety tests and someone fails those with flying colors. Let's suppose further that the officer then decides to issue his own test, which is how well you can lip sync to whatever song is on the radio, right? Something that very obviously isn't going to inform someone who's looking for the answer. Would Cobb County have a problem then? I think it would, Your Honor, if there were not the use of a recognized screening tool in order to identify drivers who are potentially impaired by drugs or alcohol. But what if the person failed all of the tests that we agree, for the purposes of this hypo, are perfectly effective? They couldn't walk the number of paces. They couldn't touch their nose. They failed all the reliable tests. And then the officer also issued this obviously unreliable test. How does that affect the situation? I don't think that would affect the existence of probable cause at all. I think you'd still have probable cause. And in our case, as has been indicated from some of the questions here, if you unplug the eye exams, there's still sufficient evidence based on erratic driving and the results of the field sobriety test, the cues or clues to support the existence of probable cause. And this was recognized in the Smallwood v. Ainsworth case 2013 from Cobb County decided by this Court. And let me add one more thing in the few seconds I have. Dr. Adams recognized in his deposition at page 51 that the eye observations to which he objected can still be valid as a screening mechanism, not as a diagnostic tool, but a screening mechanism. And an officer stopping a suspected impaired driver beside the road late at night cannot do a diagnostic test like a urine test or blood test. He can only use a screening mechanism. That's what he did. We think that the evidence is sufficient to show the existence of probable cause for what the officer, what he did, the arrest and so forth in this case. We ask the Court to affirm summary judgment. Thank you. Roberts. Thank you. Mr. Young, you've saved a few minutes. Young. Thank you, Your Honor. As much of my opponent's arguments demonstrate, especially with respect to Josh Ott's testimony, those are arguments that are designed as part of a closing argument to a jury. This debate that we're having over what did Josh Ott specifically mean when he criticized the standard field sobriety test, we believe there is a genuine issue that if you construe the record in our favor, he said that applying the standard field sobriety test is kind of like sending officers out blind to blindly apply the results of this test. If you construe that in our favor, there is a genuine issue as to whether those are reliable. I will also add that standardized field sobriety tests have never been suggestive of any of those. Is that the best testimony you have in his affidavit? Yes. And also that the only thing that standard field sobriety tests have been validated for is to indicate if somebody's a specific blood alcohol concentration or higher. They have never validated the test to indicate any sort of impairment whatsoever or anything in relation to drugs. Which does not mean that they are not reliable for that. It just means that they haven't been validated for it. Your Honor, I would just respectfully disagree that if you construe that testimony in our favor, it establishes that these tests are not reliable. Standard field sobriety tests are a threshold test. Let's go back to that. Isn't he really saying they haven't been studied? Yes. In fairness to the context of the affidavit, I'll have to read it obviously, but really what he's saying is they haven't been studied. That's true. He's saying they haven't been studied. And therefore they haven't been validated. That's true. And that's rather problematic if we're asking officers to apply tests that have never been studied. But he admits that they are reliable for indicating impairment for alcohol. Let me make a fine distinction. He says that they are reliable to detect specific blood alcohol concentration. That's actually different from impairment because under State law, you have to show alcohol in the blood that makes it less safe to drive. The impairment piece is the less safe to drive, and the standard field sobriety tests don't go to that. And that's why, again, they often follow up with a breathalyzer, as in the case of Plaintiff Ebner. I'm just curious. One of these plaintiffs now, when he came to the car, they smelled marijuana. Would you claim even there there's a cause of action? That is actually a disputed issue of fact. Our client says there was no marijuana smell. Okay. I see. Yes. So that would go to the jury as well. And the last thing I'll just say before I conclude is that in criminal cases all around the country, these tests are challenged routinely in court and trials. That doesn't mean the sky has fallen at all. Questioning the reliability of these tests is routine. And in this case, all we seek are damages. This Court should refer to that. Yes. I think if somebody's got a DUI and they had the test, they can go through the State court, and they can challenge it. It happens all the time. Several parts of the blood alcohol test have been changed. The implied consent warning's been changed. All of it's gone through the State system, and it's changed and changed and changed over time. So why wouldn't the proper remedy here to have somebody who's had this, like one of your clients, and maybe they did, did they challenge the test as they went up through the DUI process? I'm just curious. No. They say that wasn't in the right valid test. He's my expert. You should strike it down. You should tell Cobb County not to use it. That's how this normally happens rather than this 1983 custom and practice over whatever. The blood test came back negative, so the prosecutions were dismissed. But no one should have their blood forcibly drawn and being in jail for 24 hours based on a test. That is utterly unreliable. Thank you, Your Honor. Okay. Thank you. Thank you, Mr. Young. We have your case, and we'll move to our third case for today. After this case, we're going to take a short break, probably 10 minutes.